UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

IN RE: )
)
James Edward Whitley, )        Case No. 10-10426C-7G
)
Debtor. )
)
_____ )
)
Charles M. Ivey, III, Trustee )
for Estate of James Edward )
Whitley, )
)
Plaintiff, )
)        Adversary No. 11-2024
vs. )
)
Charles E. Cole, )
)
Defendant. )
)

## MEMORANDUM OPINION

This adversary proceeding came before the court on March 5, 2013, for hearing on Defendant's Motion for Partial Summary Judgment.  Christine L. Myatt and Brian Anderson appeared on behalf of the Defendant and Edwin R. Gatton appeared on behalf of the Plaintiff.

## MATTER BEFORE THE COURT

The Plaintiff seeks in this proceeding to avoid and recover from the Defendant certain payments that the Defendant received from the Debtor on the theory that such payments were fraudulent transfers under section 548(a)(1)(A) of the Bankruptcy Code and N.C. Gen. Stat. § 39-23.1, et seq.  The Defendant asserts that the payments were received by the Defendant for value and in good faith

and that the Defendant therefor is entitled to retain the funds pursuant to section 548(c) of the Bankruptcy Code and N.C. Gen. Stat. § 39-23.8(a). In the motion for summary judgment, the Defendant asserts that there is no genuine issue of material fact regarding whether he received the payments for value and in good faith and that summary judgment should be entered in his favor pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 7056 of the Federal Rules of Bankruptcy Procedure.

I.    Nature of the Plaintiff's Claims

The Plaintiff's claims rely upon the presumption of fraud that arises when a Ponzi scheme has been perpetrated.[1] According to the Plaintiff's allegations, during the period when the transactions involving the Debtor and the Defendant occurred, the Debtor presented himself to the public as owning and operating a factoring business involving invoice funding and receivables financing. The Debtor engaged in promotions, including a website and direct solicitation, to promote the appearance that he was engaged in the

---

[1] See, e.g., In re Grafton Partners, 321 B.R. 527, 532 (B.A.P. 9th Cir. 2005); Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech. Grp., Inc.), 916 F.2d 528, 536 (9th Cir. 1990); Emerson v. Maples (In re Mark Benskin Co., Inc.), 1995 WL 381741, at *5 (6th Cir. 1995); Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp., LLC), 439 B.R. 284, 305 (S.D.N.Y. 2010), In re Bernard L. Madoff Inv. Secs. LLC, 445 B.R. 206, 220-21 (Bankr. S.D.N.Y. 2011); In re Taneja, 453 B.R. 618, 621 (Bankr. E.D. Va. 2011); Liebersohn v. Campus Crusade for Christ, Inc. (In re C.F. Foods, L.P.), 280 B.R. 103, 110 (Bankr. D. Pa. 2002); Jobin v. Ripley (In re M & L Bus. Mach. Co., Inc.), 198 B.R. 800, 806-07 (D. Colo. 1996).

factoring business.   The Debtor enticed various individuals, including the Defendant, to loan him funds which the Debtor represented would be used in his alleged factoring business.   The Debtor did so by offering high rates of return for investors. Through such representations, the Debtor enticed individuals to provide funds to the Debtor.   While he was soliciting such investments, the Debtor actually was conducting little or no business activities, but continued to represent that he was doing so to his investors.   To the extent that the Debtor made payments to investors as income or repayments of principal, such payments were funded from additional funds that the Debtor had obtained from other investors, and not from any income or profits generated from genuine business operations.   The Debtor's scheme collapsed in March of 2010 when an involuntary bankruptcy case was commenced against him.  Based upon the Debtor's involvement in a Ponzi scheme when he transferred the payments at issue to the Defendant, the Plaintiff maintains that there is a presumption that such payments were made by the Debtor with actual intent to defraud, and the payments may therefore be recovered under 11 U.S.C. § 548(a)(1)(A) and  N.C. Gen. Stat. § 39-23.1.

II.  The Defendant's Motion for Summary Judgment

The Defendant's motion does not challenge the Plaintiff's allegation that the Debtor was engaged in a Ponzi scheme.  Nor does the motion challenge the Plaintiff's contention that the payments

to the Defendant were made in the course of the Debtor's Ponzi
scheme such that there is a presumption that the payments were made
by the Debtor with fraudulent intent.   The Defendant asserts,
instead, that even if the payments were made by the Debtor with
fraudulent intent, the Defendant nonetheless is entitled to retain
the payments under section 548(c).   Thus, for the purpose of
deciding the Defendant's motion for summary judgment, the
allegation that the Debtor was engaged in a Ponzi scheme will be
accepted and it will be presumed that the payments that the
Defendant received were made by the Debtor with actual intent to
defraud.  This means that the only issues for consideration at this
time are those which arise under section 548(c).

III. Analysis of Good Faith Requirement under Section 548(c)

Under section 548(c), a transferee "that takes for value and
in good faith has a lien on or may retain any interest
transferred . . . to the extent that such transferee . . . gave
value to the debtor in exchange for such transfer. . . ."  Section
548(c) functions as an affirmative defense in a fraudulent
conveyance proceeding with the result that the defendant/transferee
has the burden of proving both the value and the good faith
elements of section 548(c).  E.g. Breeden v. L.I. Bridge Fund, LLC
(In re Bennett Funding Grp., Inc.), 232 B.R. 565, 573 (Bankr.
N.D.N.Y. 1999)("[Section 548(c)] has been construed as an
affirmative defense, all elements of which must be proven by the

- 4 -

defendant-transferee."). To meet this burden, the evidence relied upon by the Defendant must be sufficient to satisfy the legal requirements of "value" and "good faith," as those terms are utilized in section 548(c).

The Defendant's argument that good faith should be determined according to a subjective standard under which good faith may be satisfied by a showing that a transferee did not have actual knowledge of any fraud on the part of the Debtor is not accepted. Instead, for the reasons that follow, the court concludes that good faith in this proceeding should be determined according to an objective standard under which good faith is dependent upon whether the circumstances known to the transferee would place a reasonable person on notice that the transfer might be fraudulent, and whether a diligent inquiry would have discovered the fraudulent purpose.

As many courts and commentators have noted, the Bankruptcy Code does not provide a definition of "good faith." While most courts have not attempted to provide a precise definition of the phrase, courts have formulated various principles and criteria for use in determining whether a transfer was received in good faith for purposes of section 548(c). See In re Telesphere Commc'ns, Inc., 179 B.R. 544, 557 (Bankr. N.D. Ill. 1994)("the courts have varied widely in the general approach they have taken in deciding questions of good faith in the context of fraudulent conveyance law"). While the principles and criteria that have been adopted

vary from case to case, they do agree that good faith should be determined on a case-by-case basis and depends upon the particular circumstances of each case.  E.g., Brown v. Third Nat'l Bank (In re Sherman), 67 F.3d 1348, 1355 (8th Cir. 1995)("Good faith is not susceptible of precise definition and is determined on a case-by-case basis.").

In deciding upon the principles or criteria that the court should apply in this proceeding, the court begins with the case of Goldman v. Capital City Mort. Corp. (In re Nieves), 648 F.3d 232 (4th Cir. 2011), the most recent and perhaps most extensive discussion of good faith by the Fourth Circuit Court of Appeals. Although the good faith issue in Nieves arose under section 550(b)(1)[2], the court is satisfied that what is said in Nieves regarding "good faith" should apply equally to "good faith" as used in section 548(c), given that the identical term is used in both sections and in both sections such term is used in the context of determining whether a transferee will be allowed to retain an avoidable transfer.  In Nieves, the court held that "good faith, as used in section 550(b)(1), should be determined under an objective standard."  Consistent with this holding, good faith in a proceeding involving section 548(c), likewise should be determined

---

[2]Under section 550(b)(1), a trustee may not recover an avoided transfer from an immediate or mediate transferee "that takes for value, . . . in good faith, and without knowledge of the voidability of the transfer avoided . . .."

under an objective standard.

In applying the objective standard, the court in Nieves affirmed the decision of the bankruptcy court that utilized a two-step approach to determining whether a transferee received a transfer in good faith. This approach involved first determining whether the defendant was placed on inquiry notice by the facts known to the transferee and, secondly, upon finding that such facts were present, then determining whether a reasonable inquiry would have disclosed the voidability of the transfer at issue. Regarding the first component, the court held that "the bankruptcy court applied the correct legal standard of objective good faith and we affirm as not clearly erroneous its factual finding that the facts known to CCM would have lead 'a lender under the circumstances of this case [to] inquire as to the record.'" Nieves, 648 F.3d at 241. Regarding the second component, the court stated that "[h]ad CCM conducted a reasonable search it would have discovered a number of facts pointing toward the voidability of the transfers." Id. at 242.

The court made clear in Nieves that under section 550(b)(1), whether an inquiry regarding a transfer is required depends upon the facts that were actually known by the transferee when the transfer was received and that a reasonable inquiry is the standard when a transferee is on inquiry notice. This court concludes that the same is true in determining good faith under section 548(c).

- 7 -

Accordingly, consistent with <u>Nieves</u>, if (1) the circumstances known to the transferee would place a reasonable person on notice that the transfer might be fraudulent, and (2) a diligent inquiry would have discovered the fraudulent purpose, then there is a lack of good faith on the part of the transferee. In <u>accord</u>, <u>Jobin</u>, 84 F.3d at 1338; <u>In re Bayou Grp., LLC</u>, 439 B.R. 284, 313-14 (S.D.N.Y. 2010)(collecting cases). Under this standard, an objective, reasonable person standard applies to both the inquiry notice and the diligent investigation components of the good faith test. <u>Jobin</u>, 84 F.3d at 1334-35 (expressly rejecting a subjective standard under which a transferee would not lack good faith unless he had actual knowledge of the fraudulent nature of the transfer); <u>Bayou</u>, 439 B.R. at 313. In this proceeding, application of the objective standard means that the first component of the above-described test will be governed by the facts that were actually known by the Defendant when the payments were received from the Debtor, and whether such circumstances would have placed a reasonable person on notice that the payments might be fraudulent. If a reasonable person would have been on notice, the relevant question then becomes whether an inquiry, if made with reasonable diligence, would have led to the discovery of the fraudulent nature of the payments. <u>Id.</u> at 316; <u>Wiand v. Waxenberg</u>, 611 F.Supp.2d 1299, 1319-20 (M.D. Fla. 2009).

- 8 -

IV.   Summary Judgment Standard in This Proceeding

Where, as in this proceeding, the moving party has the burden of proof at trial, the standard for granting summary judgment is more stringent. Nat'l State Bank v. Fed. Reserve Bank, 979 F.2d 1579, 1582 (3rd Cir. 1992). See also Ray Comm. v. Clear Channel Commc'n, Inc., 673 F.3d 294, 299 (4th Cir. 2012)("Where, as here, the movant seeks summary judgment on an affirmative defense, it must conclusively establish all essential elements of that defense."). Where the movant has the burden of proof, the summary judgment standard mirrors the standard applicable when a trial court is ruling on a motion for judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure. See 9 James Wm. Moore et al., Moore's Federal Practice ¶ 50.06[6][b] (3d ed. 2012)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L. Ed. 2d 202 (1986)(motion for summary judgment standard "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)")). The standard in this proceeding, therefore, is the same as the standard for determining whether a judgment may be directed under Rule 50 in favor of a party with the burden of proof. As the Fourth Circuit explained in Sales v. Grant, 155 F.3d 768, 775 (4th Cir. 1998), under the applicable standard the non-moving party "must be given the benefit of every reasonable inference that could be drawn from the evidence, neither weighing the evidence nor assessing its credibility" and the motion

can be granted "only if, by [such] assessment, the only conclusion a reasonable jury could draw from the evidence" is in favor of moving party.  The motion must be denied if "reasonable minds could differ as to the conclusion to be drawn from the evidence."  Id.; See 9 Moore et al., ¶ 50.05[2] n.6 ("granting judgment for party with burden of proof possible only when evidence favoring movant is overwhelming").  The Defendant has failed to satisfy this stringent standard.

According to the Defendant's evidence, the Defendant began investing with the Debtor in April of 2007 when he loaned the Debtor the sum of $100,000.  The Defendant had known the Debtor since 2005, but their relationship was not close.  The two men saw each other only three or four times a year and did not socialize with one another.  The $100,000 loan was made by the Defendant with the understanding that the money would be used in the Debtor's business.  At that time, the only information that the Defendant had regarding the Debtor's business was that the Debtor had told the Defendant that he was in the factoring business and later had introduced the Defendant to a business associate who confirmed that he and the Debtor were in the factoring business.  Although a $100,000 outlay was a significant investment from the Defendant's perspective, the Defendant says that he did not ask for any additional information regarding the Debtor's business before he made the first loan and did not receive any additional information.

- 10 -

The understanding between the Defendant and the Debtor was that the initial $100,000 loan would be repaid at the end of 2007. The Defendant received a promissory note from the Debtor but has not produced the original or a copy of such a note. The Defendant made a second loan to the Debtor on April 17, 2007, followed by a third loan on July 7, 2007, both in the amount of $100,000. Each of these loans was made by issuing a check payable to the Debtor personally rather than to the Debtor's business. According to the Defendant, he received a promissory note from the Debtor for each of these loans. Neither the originals nor copies of such notes have been produced by the Defendant. Although all three loans came due at the end of 2007, at the request of the Debtor, the Defendant agreed to rollover the loans and leave the entire $300,000 with the Debtor. The Defendant says at that point, the Debtor issued a promissory note for the entire $300,000 of indebtedness that was outstanding. No such promissory note has been produced.

In February of 2008 it became more difficult for the Defendant to get the Debtor to respond to his communications. At that time, the Defendant began asking for payments from the Debtor. After several months of such requests by the Defendant, the Debtor made a payment of $20,000 on July 8, 2008. This payment was made by a check drawn on the Debtor's personal checking account. The Debtor paid the Defendant an additional $25,000 in July of 2008, followed by another $25,000 payment in August of 2008, also with personal

checks.  These payments were in amounts that the Debtor was willing to pay and were not made pursuant to any agreed upon payment schedule, and were made only after insistent demands by the Defendant.

During the winter of 2008, Defendant found that the Debtor was being dishonest about his whereabouts and intentionally avoiding meeting with the Defendant.  Rather than intensifying his collection efforts, however, in March of 2009 the Defendant made an additional loan to the Debtor in the amount of $129,190.85.  The Defendant made this loan by cashing out an annuity.  This loan was to be repaid within sixty days and the Defendant was to receive $6,000 in interest at the end of the sixty day term.  The loan was memorialized in a promissory note prepared by the Debtor that states "I owe Chuck Cole $135,000, payable on or before May 1, 2009."  When the loan came due in May, the Defendant immediately sought payment from the Debtor.  In response, the Debtor gave the Defendant a personal check for $35,000 with the understanding that $6,000 of that amount would be treated as interest, the balance of the payment would be applied to the principal, and the unpaid balance owed on the loan would be rolled over and left with the Debtor.  When the $35,000 check was deposited by the Defendant it was not honored, but was made good by the Debtor within a few days.  This was not the first time the Debtor had given the Defendant a bad check.

By May of 2009, the relationship between the Debtor and the Defendant had become more strained and the Defendant began to demand that the Debtor repay the balance owed on the loans made by the Defendant in 2007. The Defendant found that it was increasingly difficult to get in touch with the Debtor and that when he was able to meet with the Debtor, the Debtor did not thereafter follow through on his promises to repay the loans. The Defendant continued to press the Debtor and was able to obtain payments of $15,000 and $1,900 from the Debtor in September of 2009. The Defendant was not able to obtain any further payments from the Debtor prior to the bankruptcy proceeding that was initiated against the Debtor in March of 2010. During this entire period, the Debtor continued to solicit the Defendant to make additional investments with him.

According to the Defendant's testimony, he received several promissory notes in the amount of $300,000 after the first three loans had been rolled over. The three promissory notes produced by the Defendant do not reflect any such transactions. While one of the promissory notes does correspond to the Defendant's description of the loan that was made in March of 2009, the other two promissory notes are inconsistent with his testimony. One of these promissory notes is dated August 8, 2008, and states "I owe Chuck Cole $150,000, payable on or before December 31, 2008." The other promissory note is undated and states "I owe Chuck Cole $150,000,

payable on or before December 31, 2009." Similar to the third note from March, neither of these documents specifies an interest rate. However, both are prepared in the identical format as the third note which states "I owe Chuck Cole $135,000, payable on or before May 1, 2009." This latter promissory note admittedly included interest that was to be paid on the due date. Since the two $150,000 notes contain identical provisions except for the amounts of the notes and the dates on which payment is due, it is a reasonable inference that, as in the case of the $135,000 note, these notes likewise included interest that was to be paid on the due date which has not been disclosed by the Defendant.

While the Defendant testified that the interest rate on the earlier loans was to be eight percent to ten percent "with no guarantee," no promissory note or other document reflecting such an interest rate has been produced. An interest rate, however, can be gleaned from the $135,000 promissory note. Pursuant to that note, the Defendant admittedly received $6,000 of interest for a sixty day loan of $129,190.85, which yields an annual percentage rate of nearly twenty-eight percent. The Defendant knew little about the factoring business or the type of returns that the Debtor would be able to obtain in his alleged factoring business. Moreover, the Defendant was aware of the returns that he was receiving on his other investments and bank accounts and knew that an annual percentage rate of twenty-eight percent was significantly greater

- 14 -

than he was able to obtain from any other source.  This is reflected in the Defendant's deposition testimony in which he stated he would not be receptive to an investment that offered an annual percentage rate as high as twenty percent because "20% would be a little bit suspect."

When he made the loans, the Defendant had investments such as equities and mutual funds, and had a financial adviser that he consulted regarding his investments.  Although the amounts of the loans he made to the Debtor were substantial, the Defendant says he did not make any type of investigation or conduct any type of due diligence regarding the Debtor or the business the Debtor had described before he began making loans to the Debtor.  Nor did the Defendant seek any advice from his financial advisor regarding the loans to the Debtor.  Based on his experience from his other investments, the Defendant also was aware that he received regular statements and reports regarding such investments and realized no such reports or statements, written or otherwise, were being provided by the Debtor.  Even so, the Defendant says that he never sought to obtain information from the Debtor regarding his business, such as whether the existence or location of a business office, the number of employees, a list of customers, or the particular factoring deals for which the loans were sought.

Although the Defendant had been told that the Debtor had a factoring business and that the loans were for use in the business,

the checks written by the Defendant to fund the loans were made payable to the Debtor personally and not to a business even after the Defendant had become aware of South Wynd Financial. Also, the checks that the Defendant received from the Debtor were drawn on the Debtor's personal account and not a business account.

Although the Defendant had obtained business and personal loans from lenders in the past and was aware that formal printed documents were required for those loans, including printed promissory notes containing extensive terms, the documentation he received from the Debtor was much different, and consisted of documents prepared by the Debtor on a single sheet of paper. These documents were scarcely more than IOUs and included little more than the amount of the loan, a date, and the Debtor's signature.

As early as February of 2008, when the Defendant began to obtain payments from the Debtor, the Defendant began to encounter difficulty in communicating with the Debtor. The first payment from the Debtor in July of 2008 was preceded by numerous unheeded requests for payments. During the winter of 2008, the Defendant found that the Debtor was lying about his whereabouts and whether he was available to meet with the Defendant. Several checks that the Defendant received from the Debtor bounced, including a check for $35,000. The Defendant's requests for payments of principal after that went unheeded until two payments were made in September of 2009. Despite these difficulties, the Defendant made no

investigation of the Debtor or his business.

The Defendant's loans to the Debtor were not extended as a favor to a friend. The loans were business transactions which were prompted by a profit motive, i.e., the interest the Debtor was willing to pay the Defendant in order to obtain the loans. The Defendant made these loans with little knowledge regarding the Debtor's alleged business and with virtually no due diligence. By any measure, the loans were at the high end of the risk scale. One inference that could be drawn is that the interest rate that was required in order to induce the Defendant to take the substantial risk associated with making large loans to the Debtor was of a magnitude that should have prompted inquiry regarding the Debtor.

When these circumstances and the reasonable inferences that follow are examined under the standard articulated in Sales v. Grant, the court does not find that the only conclusion that a jury could draw in this case would be in favor of the Defendant. The situation, instead, is one in which reasonable minds could differ as to whether the facts and circumstances known to the Defendant would have placed a reasonable person on inquiry notice regarding the Debtor's fraudulent purpose and as to whether a reasonable inquiry would have disclosed the Debtor's fraud. The Defendant, therefore, is not entitled to summary judgment with respect to the good faith issue.

V.  Analysis of the Value Requirement under Section 548(c)

A good faith transferee can prevent the avoidance of a challenged transfer under section 548(a)(1)(A) and N.C. Gen. Stat. § 39-23.1 by demonstrating that he took the transfer in exchange for value.  "Value" is defined both in the Bankruptcy Code and under the North Carolina Fraudulent Transfer Act to include a transfer in exchange for the satisfaction of an antecedent debt. N.C.Gen.Stat. § 39-23.3(a); 11 U.S.C. § 548(d)(2)(A).  In the case of Ponzi schemes, the general rule is that a defrauded investor gives "value" to a debtor in exchange for payments that in the aggregate do not exceed the principal amount of the investment, but not as to any payments in excess of principal. Perkins v. Haines, 661 F.3d 623, 627 (11th Cir.2011); Donell v. Kowell, 533 F.3d 762, 770 (9th Cir. 2008); Scholes v. Lehmann, 56 F.3d 750, 757-58 (7th Cir. 1995).  Under a concept referred to as the "netting rule" most courts determine the liability of an investor in a Ponzi scheme by comparing the amount of a defendant's principal investment with the aggregate amount received in return on the investment.  See Donnell, 533 F.3d at 770.  An investor who receives a positive return on investment is liable under the fraudulent conveyance statute for any amount received in excess of the investor's principal investment, regardless of whether the investor received the payments in good faith, because payments in excess of principal are not made for value.  Id.  Where payments received by a

defendant in good faith do not exceed a defendant's principal investment however, these payments are supported by value and a defendant is entitled to retain the amounts under 11 U.S.C. § 548(c). See In re Lake States Commods., Inc., 253 B.R. 866, 872 (Bankr. N.D. Ill. 2000) (collecting cases).

From January 2002 until July 15, 2009, the Defendant invested a total of $335,000 with the Debtor and received $124,200 in payments from the Debtor. Put another way, the Defendant is a net loser because he invested approximately $210,000 more in the Debtor's Ponzi scheme than he received in return. The Plaintiff produced no evidence to rebut and apparently does not dispute the Defendant's evidence that he did not receive payments from the Debtor in excess of his principal. Under these facts, which clearly show that the Defendant is a net loser, the court concludes that there is no material issue of fact regarding whether the Defendant "gave value" under section 548(c) nor as to the extent of the value given by the Defendant, such value being equal to the full amount of the payments received from the Debtor. The Defendant, therefore, is entitled to summary judgment with respect to the value requirement under section 548(c).

VI.  Conclusion

Based upon the foregoing, the court concludes that the Defendant's motion for summary judgment should be denied as to whether the transfers from the Debtor were received in good faith

and should be granted as to whether the Defendant gave value for the payments received from the Debtor.  An order so providing shall be entered contemporaneously with the filing of this memorandum opinion.

    This ⟨1st⟩ day of May, 2013.


WILLIAM L. STOCKS
United States Bankruptcy Judge

PARTIES IN INTEREST


Edwin R. Gatton, Esq.
P.O. Box 3324
Greensboro, NC 27402

Christine L. Myatt, Esq.
Brian Anderson, Esq.
P.O. Box 3463
Greensboro, NC 27408